## COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

CARL WAYNE BRUCE,

      Defendant-Appellant.

UNPUBLISHED
August 17, 2017

No. 328925
Oscoda Circuit Court
LC No. 14-001354-FC

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

RACHEL LYNN BRUCE,

      Defendant-Appellant.

No. 329484
Oscoda Circuit Court
LC No. 14-001355-FC

Before: CAVANAGH, P.J., and METER and M. J. KELLY, JJ.

PER CURIAM.

Defendants Carl Bruce and Rachel Bruce were tried jointly, before a single jury. The jury convicted both defendants of first-degree felony murder, MCL 750.316(1)(b), first-degree vulnerable adult abuse, MCL 750.145n(1), and second-degree vulnerable adult abuse, MCL 750.145n(2). Carl Bruce ("Carl") appeals as of right in Docket No. 328925, and Rachel Bruce ("Rachel") appeals as of right in Docket No. 329484. We reverse each defendant's convictions and remand for a new trial.

Defendants' convictions arise from their alleged mistreatment of Rachel's father, Herman Richey, Jr., who died while in defendants' care on October 24, 2012. The cause and manner of the decedent's death was a principal issue at trial. Although evidence indicated that the decedent suffered from a variety of medical ailments, including Alzheimer's disease, dementia, heart disease, high blood pressure, and degenerative disc disease, the prosecution's theory of the case was that defendants neglected and mistreated the decedent, who eventually died from malnutrition. In support of its theory, the prosecution presented the testimony of Rose Ross, who

-1-

responded to defendants' home after the decedent's reported death. Ross was a nurse practitioner who was also certified as a medical examination investigator. She was qualified as an expert in both of these fields.

Ross examined the decedent's body. She testified that the decedent was very thin, with a concave abdomen, protruding ribs, and no muscle mass to his arms or legs. His skin was yellow, and he had many bruises, scrapes, and scabs on his arms and knees. His skin had no "tugor" or fluid in it and was extremely dry. The decedent had fecal matter around and underneath his fingernails. He had a bedsore on his hip from lying for a long period of time without being moved. Areas around his buttocks and groin were "very raw," as if "eaten away from constant exposure to urine and fecal matter." Ross was not able to obtain any urine from the decedent's bladder. Ross discussed her findings with the medical examiner, Dr. Wahl. They completed a death certificate that listed malnutrition and Alzheimer's as the cause of death, with the manner of death as natural. Ross testified that she later concluded that the decedent's death was caused by neglect, but admitted that the death certificate was never amended to reflect that conclusion. At trial, Ross testified that it was her opinion that the decedent died from malnutrition, but she did not know the actual physiological component that led to his death. An autopsy of the decedent was never conducted. Defendants did not call an expert witness at trial to challenge Ross's medical opinion testimony.

## I. SUFFICIENCY OF THE EVIDENCE

Both defendants argue that the evidence at trial was insufficient to support their convictions. A challenge to the sufficiency of evidence is reviewed de novo. *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010). This Court must review the evidence in a light most favorable to the prosecution and determine whether the jury could have found each element of the charged crimes proved beyond a reasonable doubt. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). "Circumstantial evidence and reasonable inferences arising therefrom may constitute proof of the elements of [a] crime." *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). "[A] reviewing court is required to draw all reasonable inferences and make credibility determinations in support of the jury verdict." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Because of the difficulties inherent in "proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999). The prosecution need not "disprove every reasonable theory consistent with innocence to discharge its responsibility; it need only convince the jury in the face of whatever contradictory evidence the defendant may provide." *Nowack*, 462 Mich at 400 (citation and quotation marks omitted). When reviewing the sufficiency of the evidence, a reviewing court should consider all evidence admitted at trial, even if it was erroneously admitted. *McDaniel v Brown*, 558 US 120; 130 S Ct 665, 672; 175 L Ed 2d 582 (2010).

Defendants were convicted of one count each of first-degree vulnerable adult abuse and second-degree vulnerable adult abuse, contrary to MCL 750.145n, which provides, in pertinent part:

(1) A caregiver is guilty of vulnerable adult abuse in the first degree if the caregiver intentionally causes serious physical harm or serious mental harm to a vulnerable adult.

\* \* \*

(2) A caregiver or other person with authority over the vulnerable adult is guilty of vulnerable adult abuse in the second degree if the reckless act or reckless failure to act of the caregiver or other person with authority over the vulnerable adult causes serious physical harm or serious mental harm to a vulnerable adult.

Thus,

[t]o establish the crime of second-degree vulnerable adult abuse, the prosecutor must prove (1) that the defendant is a caregiver or other person with authority over the vulnerable adult, (2) that the victim is a vulnerable adult, (3) that the defendant engaged in a reckless act or reckless failure to act, and (4) that the reckless act or reckless failure to act caused serious physical harm or serious mental harm to a vulnerable adult. [*People v DeKorte*, 233 Mich App 564, 567; 593 NW2d 203 (1999).]

The statute defines a "reckless act or reckless failure to act" as "conduct that demonstrates a deliberate disregard for the likelihood that the natural tendency of the act or failure to act is to cause physical harm, serious physical harm, or serious mental harm." MCL 750.145m(p).

Similarly, "to prove first-degree vulnerable-adult abuse, the prosecution would have to show that a defendant intentionally caused serious physical harm" or serious mental harm to the vulnerable adult. *People v Comella*, 296 Mich App 643, 650; 823 NW2d 138 (2012). " 'Serious physical harm' means a physical injury that threatens the life of a vulnerable adult, that causes substantial bodily disfigurement, or that seriously impairs the functioning or well-being of the vulnerable adult." MCL 750.145m(r). " 'Serious mental harm' means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner." MCL 750.145m(s).

Both first-degree vulnerable adult abuse and second-degree vulnerable adult abuse may serve as predicate offenses for first-degree felony murder. MCL 750.316(1)(b); *Comella*, 296 Mich App at 651. The elements of felony murder are (1) the killing of a person, (2) with the intent to kill, do great bodily harm, or create a high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of an enumerated felony. *People v Carines*, 460 Mich 750, 758-759; 597 NW2d 130 (1999); *People v Lane*, 308 Mich App 38, 57-58; 862 NW2d 446 (2014); see also MCL 750.316(1)(b). "The facts and circumstances of the killing may give rise to an inference of malice. A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Carines*, 460 Mich at 759. A prosecutor can prove malice "[e]ven absent concrete proof of a particular act causing death[.]" *People v Nelson*, 493 Mich 933; 825 NW2d 581 (2013). Intent to do great bodily harm is "an intent to do serious injury of an aggravated nature." See *People v*

-3-

*Brown*, 267 Mich App 141, 147; 703 NW2d 230 (2005) (quotation marks and citation omitted). The intent to do great bodily harm can be inferred from minimal circumstantial evidence "and reasonable inferences drawn therefrom." *People v Peña*, 224 Mich App 650, 659; 569 NW2d 871 (1997), mod in part on other grounds 457 Mich 885 (1998); see also *People v Guthrie*, 262 Mich App 416, 419; 686 NW2d 767 (2004).

Defendant Carl Bruce challenges only the causation element. Many of his arguments rely on a common theme. He essentially maintains that insufficient data was presented to establish the decedent's actual cause of death, and therefore, the jury could not find that the decedent's death resulted from dehydration or malnutrition. He notes the testimony describing the decedent's various illnesses and medical conditions, and emphasizes that Ross, the medical examination investigator, admittedly did not know the physiological component that led to the decedent's death, e.g., a heart arrhythmia, kidney failure, or liver failure. Carl also argues that there were "deficiencies" in the investigation.[1]

Contrary to Carl's contentions, the evidence was sufficient to support his convictions. With respect to first-degree vulnerable adult abuse, Carl ignores that the prosecution could meet its burden by demonstrating that Carl intentionally caused either serious physical harm or serious mental harm. Even without considering Rachel's statements from her police interrogation, which as further discussed below should not have been admitted against Carl, Rachel's children testified that Carl locked the decedent in his bedroom, ignored his frequent and lengthy pleas to be released, and sometimes yelled back at the decedent in a mocking manner. Other testimony supports a finding that the decedent was sometimes locked in his room with an overflowing portable toilet. Photographs of the decedent's body depicted the sores and rashes he endured, and testimony indicated that he was forced to live in dirty diapers and had fecal matter under his fingernails. Other photographs depicted the condition of the decedent's room, including scabbing and other detritus on the floor from the decedent's attempts to crawl to the door to be let out. This evidence was corroborated by Rachel's children, as well as Rachel's statements to Ross when Ross first arrived at the scene. Although the photographs and testimony concerning the condition of the decedent and his attempts to leave the room support a finding that defendants caused severe physical harm to the decedent, they also support a finding that defendants caused serious mental harm by imprisoning the decedent in his room against his will. Viewed in a light most favorable to the prosecutor, the evidence concerning the entirety of the decedent's circumstances while imprisoned in his room was sufficient to enable the jury to find both defendants guilty of first-degree vulnerable adult abuse.

Much of this evidence also supports a finding that defendants either intentionally or negligently caused serious physical harm to the decedent. Again, the photographic evidence and testimony, viewed in a light most favorable to the prosecution, shows that defendants allowed the decedent to exist covered in filth, without treatment of his open wounds. Ross testified that the

---

[1] Carl relies in part on expert testimony that was not admitted at trial, but was first presented at a posttrial evidentiary hearing. Because that testimony was not presented at trial, it is not relevant in determining whether the evidence at trial was sufficient to support the convictions.

bedsore on the decedent's hip indicated that he was not moved as he lied on the bed. Moreover, the evidence indicated that the decedent was lying in a very large wet area and Ross testified that some of the decedent's extensive skin damage was due to it having been "eaten away from constant exposure to urine and fecal matter." Even if, as Carl argues, the evidence was insufficient to show that the scarring from the wounds would result in "substantial bodily disfigurement," the jury could reasonably find that the nature and condition of the wounds would have "seriously impair[ed] the functioning or well-being of the vulnerable adult" under MCL 750.145m(r).

Much of Carl's argument concerns whether their treatment of the decedent directly led to his death. The evidence, viewed most favorably to the prosecution, was sufficient to support such a conclusion. According to Ross, Rachel told her that Carl fed the decedent once in the 24 hours before his death, and no one gave the decedent any water or liquid nourishment at any other time during that period. Although one of Rachel's sons maintained that the decedent was fed twice daily, with the exception of a period when neither the decedent nor the children were regularly fed because Carl was not working, the other child testified that Carl sometimes did not feed the decedent two or three times a week. Ross testified that the decedent was emaciated and malnourished. Ross also testified that the dryness and lack of "tugor" or fluidity in the decedent's skin indicated that he was dehydrated. Ross testified that she could not obtain urine from the decedent's bladder, further supporting a finding that he was severely dehydrated. Photographs admitted at trial more graphically depicted the extent of the decedent's malnutrition.

Although Ross admitted that she did not know which system failure actually resulted in the decedent's death (e.g., loss of liver function, loss of kidney function, or death from a heart attack due to a potassium, phosphorous, or calcium imbalance), she was unequivocal in her testimony that any of these conditions would not have occurred without the malnutrition and dehydration suffered by the decedent. A prosecutor can prove malice "[e]ven absent concrete proof of a particular act causing death[.]" *Nelson*, 493 Mich at 933. While Carl argues that the evidence was insufficient to determine cause of death because it required "speculation," the jury was free to infer causation, even to the extent that such an inference depended on additional inferences. *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). Moreover, to the extent Carl challenges the weight or credibility of Ross's testimony, "the issue of credibility is for the jury to decide" and this Court "will not resolve credibility issues anew on appeal." *People v Milstead*, 250 Mich App 391, 404; 648 NW2d 648 (2002).

The fact that Carl can suggest other possible explanations for the decedent's sores or emaciation does not compel a finding of insufficient evidence. The prosecutor and defendants provided different explanations for the evidence presented, and the jury resolved that conflict in favor of the prosecution. It is for the trier of fact to decide what inferences can be fairly drawn from the evidence and to judge the weight it accords to those inferences. *Hardiman*, 466 Mich at 428; *People v Unger*, 278 Mich App 210, 222; 749 NW2d 272 (2008). The prosecutor was not required to affirmatively disprove that the victim died simply of natural causes as a result of advanced Alzheimer's or one of his other chronic ailments. See *Nowack*, 462 Mich at 400.

Carl's argument that malnutrition and bed sores can also occur in nursing homes ignores that nursing homes would presumably try to treat these conditions or seek other medical help before they become so extreme. Ross testified that Rachel told her that the decedent had

degenerative disc disease, with back pain, as well as heart disease, but he had not seen a doctor for more than a year. The decedent's medical records indicated that the decedent may not have been seen by a doctor for a year and a half before his death. While the decedent's unwillingness to see a doctor might explain why defendants delayed seeking treatment, the jury reasonably could have found that defendants should have known that the decedent required medical attention despite his preferences, particularly considering that the decedent suffered from Alzheimer's or some other type of dementia. The facts and circumstances of the case were sufficient to enable the jury to find beyond a reasonable doubt that Carl acted with malice, i.e., that he intended to create, at a minimum, a very high risk of death or great bodily harm for the decedent, knowing that death or great bodily harm was a probable result of the manner in which he was treated by Carl and the failure to seek appropriate medical treatment. See *Carines*, 460 Mich at 759.

Rachel's arguments concerning the lack of evidence supporting cause of death and the element of malice are substantially similar to Carl's and, for the same reasons, are unpersuasive. In order to prove that Rachel committed first- and second-degree vulnerable adult abuse, the prosecutor had to prove that Rachel intentionally caused either serious physical harm or serious mental harm to the decedent, MCL 750.145n(1); *Comella*, 296 Mich App at 650, and that she "engaged in a reckless act or reckless failure to act" and "the reckless act or reckless failure to act caused serious physical harm or serious mental harm to a vulnerable adult." MCL 750.145n(2); *DeKorte*, 233 Mich App at 567. With respect to the malice element of felony murder, the prosecution had to prove that Rachel intended to kill the decedent, intended to cause the decedent great bodily harm, or intended "to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result." *Carines*, 460 Mich at 759. "The facts and circumstances of the killing may give rise to an inference of malice. A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Id.* A prosecutor can prove malice "[e]ven absent concrete proof of a particular act causing death[.]" *Nelson*, 493 Mich at 933.

This Court has held that proof of starvation, standing alone, "is insufficient to infer the element of malice necessary to sustain a bindover for second-degree murder." *People v Giddings*, 169 Mich App 631, 634; 426 NW2d 732 (1988). However, "starvation or other omissions, when coupled with evidence of the appropriate intent," *id.*, may establish the requisite malice. In the instant case, testimony that the decedent died due to complications from malnutrition and dehydration, particularly when coupled with Rachel's admission to Ross that the decedent was fed once a day and was not given water during the 24 hours preceding his death, supports an inference that defendants' actions or inactions caused the decedent's death. With respect to intent, evidence was presented that Rachel admitted being overwhelmed caring for the decedent. This was particularly evidenced by her repeated statements during her police interviews that she retreated to her room during the weeks preceding the decedent's death. Rachel admitted that, rather than seek outside assistance, she essentially gave up. With respect to vulnerable adult abuse, this would at least support a finding of "a deliberate disregard of the likelihood that the natural tendency of the act or failure to act is to cause physical harm, serious physical harm, or serious mental harm" under MCL 750.145m(p). This also constitutes circumstantial evidence of an intent to "create a high risk of death or great bodily harm with the knowledge that death or great bodily harm was the probable result." *Carines*, 460 Mich at 758-

759. "A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Id.* at 759.

For these reasons, we reject defendants' arguments that the evidence was insufficient to support their convictions.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Both defendants also argue that they are entitled to a new trial due to ineffective assistance of counsel. The trial court considered and rejected defendants' ineffective assistance of counsel claims after conducting a *Ginther*[2] hearing. Whether a person has been denied the effective assistance of counsel is a mixed question of fact and constitutional law. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). "Findings on questions of fact are reviewed for clear error, while rulings on questions of constitutional law are reviewed de novo." *Id.* To establish ineffective assistance of counsel, a defendant must show that: (1) counsel's representation "fell below an objective standard of reasonableness"; and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome of the proceeding would have been different. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012), citing *Strickland v Washington*, 466 US 668, 688-694; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. This Court presumes that defense counsel rendered effective assistance and exercised reasonable professional judgment in all significant decisions. *Vaughn*, 491 Mich at 670. The defendant must "overcome the strong presumption that counsel's performance was born from a sound trial strategy." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012).

## A. PLEA NEGOTIATIONS

Both defendants argue that they were deprived of an opportunity to accept a favorable plea offer because of counsel's deficient performance. The record does not support defendants' arguments.

In the context of plea negotiations, counsel has "the critical obligation" to advise the defendant of the advantages and disadvantages of a plea agreement, and counsel must provide advice during plea negotiations that is sufficient to allow the defendant "to make an informed and voluntary choice between trial and a guilty plea." *People v Douglas*, 496 Mich 557, 594-595; 852 NW2d 587 (2014) (citations omitted). To establish prejudice arising out of the failure to convey or the rejection of a plea offer, a defendant must demonstrate a reasonable probability that he would have accepted the offer if he had been afforded effective assistance, that there is a reasonable probability that the plea would have been completed without withdrawal by the prosecutor or rejection by the court, and that there is a reasonable probability that the plea would have been to a lesser charge or would have subjected the defendant to a lesser prison sentence. *Id.* at 592.

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

Carl asserts that his attorney never conveyed an offer to allow him to plead guilty to first-degree vulnerable adult abuse, with a sentence agreement of 3 to 15 years' imprisonment. At the posttrial evidentiary hearing, however, Carl acknowledged that he and counsel spoke about the charges and the possible penalty if found guilty of felony murder. Both of Carl's attorneys, as well as the prosecutor, testified that Carl was not willing to accept a plea offer to anything more than a misdemeanor, which the prosecutor refused to offer. Indeed, Carl acknowledged that he thought the prosecutor would make a better offer if he turned the first one down. The record does not support Carl's ineffective assistance claim with respect to the plea negotiations.

With respect to Rachel, the trial court found that Rachel's counsel explained the consequences of going to trial and advised her of his belief that they could do better at trial than an offered plea to manslaughter, that Rachel relied on her attorney's advice and opted to go to trial, and that counsel "was clear that it is not his practice to convince anyone to do anything" but instead gave Rachel his advice and she decided not to accept the plea offer. These findings are supported by the testimony at the evidentiary hearing. Rachel's counsel testified that he spoke with Rachel about the charges, the proofs necessary to obtain a conviction, and the possible ramifications of a conviction or guilty plea. He admitted that he did not think Rachel should take the plea offer because he did not believe the prosecutor could prove the elements necessary to obtain convictions. He denied, however, that he convinced Rachel not to take the offer. Rachel testified that she trusted counsel, and believed him when he told her that he did not think the prosecution would be able to meet its burden of proof. However, she also stated that she did not take the offer because she did not think she was guilty. She further acknowledged that counsel explained the potential consequences of a murder conviction. The trial court did not clearly err in finding that counsel sufficiently advised Rachel so that she could make an informed and voluntary choice whether to accept or reject the plea offer. See *Douglas*, 496 Mich at 594-595. Rachel has not demonstrated that she is entitled to relief on this ground.

## B. FAILURE TO CALL A DEFENSE EXPERT

Both defendants also argue that they were deprived of the effective assistance of counsel when their attorneys failed to call a defense expert to refute Ross's testimony concerning the cause of the decedent's death. We agree.

Preliminarily, the record discloses that the defense attorneys attempted to obtain funds to retain a defense expert, but the trial court denied their motion on procedural grounds because it was not properly noticed for hearing. Given that counsel attempted to obtain funds for an expert but were unable to do so through negligence, defendants have shown an objectively unreasonable error in failing to obtain an expert witness concerning cause of death.

To support a finding that they were prejudiced by the failure to call a defense expert, defendants presented the testimony of Oakland County Chief Medical Examiner Ljubisa Dragovic, M.D., at a posttrial *Ginther* hearing. Following the hearing, plaintiff argued, and the trial court found, that defendants were unable to establish prejudice because Dr. Dragovic's testimony was substantially similar to Ross's trial testimony, and therefore, it would not have made a difference at trial. We disagree.

At the evidentiary hearing, Dr. Dragovic testified that because no autopsy was performed, the question whether the decedent died from malnutrition or "just appeared malnourished and emaciated is something that one would like an answer to, but there was no post-mortem examination done." Dr. Dragovic stated that he could neither agree nor disagree that malnutrition was a cause of the decedent's death because malnutrition was only an observation and "the core issues here are the underlying conditions that [the decedent] suffered from." Dr. Dragovic could not disagree with the information in the investigator's report. He stated that the observations were documented and reported, but he cautioned that "a step further in order to come to the bottom of the issues was absolutely necessary if there was any consideration of this death being other than natural." He stated that malnutrition could also have come about from a disease process or obstruction in the esophagus or gullet, problems in the stomach, or problems of malabsorption in the small bowel "that are gargantuan." He stated that the investigation in the case did not meet "the basic standards of a forensic pathological investigation of a death." Regarding deficiencies in the investigation, he stated that there seemed to be a disconnect between Dr. Wahl, the medical examiner who issued the death certificate, and Ross, "who obviously has plenty of experience in this activity but does not necessarily have the capability of carrying out complete medical, legal death investigation." He also stated that Ross's methodology of just "eyeballing" the remains of the decedent "was not enough for the establishment [of] evidence beyond a reasonable doubt." Although he acknowledged that he had used eyewitness testimony in helping to determine cause of death, he clarified that "it becomes an educated guess without an examination of the body" and that "an educated guess does not represent solid evidence." Dr. Dragovic also stated that the fact that the decedent suffered from dementia was a factor, but that Ross could not determine whether the decedent actually had Alzheimer's without further investigation, and that it was not her duty as a medical investigator to determine cause of death.

In rejecting defendants' claims of ineffective assistance of counsel for failure to call a medical expert, the trial court held that the crux of Dr. Dragovic's testimony "was that he would have wanted an autopsy before forming an opinion as to cause and manner of death," that Dr. Dragovic would not have offered an alternative cause of death, and he would not have agreed or disagreed with Ross. The court also recognized that Ross acknowledged that she was not certain "as to the physical or anatomical component" of the decedent's death. The court found that Dr. Dragovic's testimony "would not have offered a competing opinion to Investigator Ross in that he testified he was unable to form an opinion and could not agree or disagree with Ms. Ross," and thus defendants could not demonstrate a substantial likelihood of a different result.

We believe that the trial court misinterpreted the crux of both Ross's and Dr. Dragovic's testimony. While Ross testified that she did not know exactly the manner in which the dehydration or malnutrition caused the decedent's death, she unequivocally testified that the death was caused by dehydration and malnutrition, and that an underlying cause for these conditions was neglect. Dr. Dragovic did not simply testify that he could not offer a different opinion or agree or disagree with Ross. He explained why no medical examiner could properly conclude that malnutrition actually caused the decedent's death based on the limited investigative techniques performed by Ross. Such testimony would have undercut the foundation for Ross's opinion that the decedent's death was caused by malnutrition and dehydration. Dr. Dragovic also testified that Ross could not have reliably found that the decedent even had Alzheimer's, a diagnosis she used to refute defendants' version of the events

because the body of a person dying from end-stage Alzheimer's would shut down, and they would refuse to eat and usually lie there for several days until death occurs; Ross testified that the decedent's ability to sit up and eat was incompatible with end-stage Alzheimer's. Contrary to the trial court's finding and plaintiff's arguments on appeal, the testimonies of Ross and Dr. Dragovic were not in any way consistent. Although Dr. Dragovic acknowledged that he was not able to offer an opinion on the cause of the decedent's death, he explained that the limited information available precluded any medical expert from reliably determining the cause of the decedent's death. This testimony would have undermined the reliability of Ross's testimony that malnutrition and dehydration caused the decedent's death.

The trial court noted Dr. Dragovic's testimony that, in his opinion, the limited examination conducted was not sufficient to establish a cause of death "beyond a reasonable doubt." The trial court reasoned that "[t]hat conclusion lies within the province of the jury and was not Dr. Dragovic's to make." However, because defendants did not call a medical expert at trial, the jury did not have an opportunity to consider this competing opinion. MRE 704 states:

> Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

See also *People v Smith*, 425 Mich 98, 106; 387 NW2d 814 (1986). In a homicide case, expert medical testimony may be presented "concerning both the cause and the manner of a decedent's death" where it is useful to the trier of fact. *Unger*, 278 Mich App at 251-253. Viewed in context, Dr. Dragovic did not simply state that the evidence presented at trial was insufficient to find the defendants guilty of first- or second-degree vulnerable adult abuse or to convict them of felony murder. His use of the legal phrase "beyond a reasonable doubt" notwithstanding, his testimony was directed at Ross's ability to reliably determine a cause of death based on the limited information available. This was within the purview of an expert witness.

The conclusion that defendants were prejudiced by the failure to call an expert witness to attack the foundation for Ross's testimony concerning cause of death is also supported by the trial court's jury instructions on felony murder. A felony-murder conviction required proof beyond a reasonable doubt that the decedent's death was directly caused by defendants' actions in failing to provide the decedent with nutrition and hydration, even if other causes may also have played a role. In light of Dr. Dragovic's testimony, even if the jury believed that defendants had something to do with the decedent's emaciated and dehydrated condition, it may have been unable to find that the decedent's death was the natural or necessary result of defendants' actions. Thus, with respect to the felony-murder conviction, defendants have demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Vaughn*, 491 Mich at 670, quoting *Strickland*, 466 US at 694.

Although Dr. Dragovic's testimony did not directly refute Ross's testimony concerning the vulnerable adult abuse charges, we believe that the lack of an expert witness, coupled with other errors, tainted the entire proceeding such that a new trial on all charges is warranted. "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the

-10-

outcome." *Strickland*, 466 US at 694. The prosecutor repeatedly stressed that the harm to the decedent was the dehydration and emaciation that led to the decedent's death. A finding of guilt of first-degree vulnerable adult abuse could have been based on either of two alternate theories and different types of injury, and it is difficult to discern what effect Dr. Dragovic's testimony, if believed, would have had on the jury's findings with respect to the additional charges. Considering the importance of Ross's testimony to each of the charges in the case, and that Dr. Dragovic's testimony would have undermined the reliability of that testimony, we are persuaded that the failure to present expert testimony to challenge the foundation for Ross's testimony undermines the reliability of the jury's verdict. Accordingly, we reverse defendants' convictions on all charges and remand for a new trial.

## C. ADMISSION OF RACHEL'S POLICE INTERROGATION AGAINST CARL

Carl further argues that defense counsel was ineffective for allowing Rachel's post-arrest interview to be admitted, without limitation, at their joint trial, thereby allowing the jury to consider the statements as evidence against him. We, again, agree.

It is well-established that a prosecutor is barred from using a codefendant's extrajudicial statements inculpating another defendant when the codefendant does not testify and the defendant has not had a prior opportunity to cross-examine the codefendant. *People v Nunley*, 491 Mich 686, 698; 821 NW2d 642 (2012). Plaintiff concedes that Rachel's interview statements to Deputy Dedyne were not admissible against Carl. Defense counsel offered no reasonable explanation for failing to object to the admission of Rachel's statements against Carl at their joint trial. He stated only that it did not occur to him to object at trial. In addition, although defense counsel offered strategic reasons for wanting to have Carl tried jointly with Rachel, he did not request separate juries, a procedure that would have allowed the defendants to be tried jointly, but could have alleviated any potential prejudice resulting from the admission of Rachel's statements by restricting the admission of this evidence to only her jury. See *People v Hana*, 447 Mich 325, 346 n 7, 351; 524 NW2d 682, amended 447 Mich 1203 (1994) (observing that the use of dual juries may allay the risk of prejudice to a defendant where evidence probative of a defendant's guilt is technically admissible only against a codefendant).

Plaintiff argues that Carl was not prejudiced by the admission of Rachel's statements because the statements were cumulative of other evidence presented at trial. We disagree. Although some of Rachel's statements mirrored the testimony of other witnesses, Rachel's interview included numerous other statements directly incriminating Carl or attacking his character, which were not supported by independent evidence. Rachel accused Carl of effectively stealing some of the decedent's money after she took it out of the bank to pay bills. She further testified that: (1) Carl beat her so she could not obtain help, (2) Carl took, used, and sold the decedent's narcotics and pain medication; (3) Carl locked the decedent in his room for spite, and (4) Carl "ran the show" while Rachel cowered in her room. Rachel continually minimized her own involvement at Carl's expense. Moreover, Deputy Dedyne told Rachel during the interview that she had always been cooperative with him and he believed she was telling him the truth. Although the jury was told after the interview was played "not to consider any domestic violence between Mr. Bruce and Mrs. Bruce," the references to Carl's mistreatment of Rachel were pervasive. It would be unrealistic to conclude that this pervasive testimony, inadmissible against Carl, had no effect on the jury's verdict with respect to Carl.

Accordingly, we conclude that Carl's counsel was also ineffective for failing to either object to the admission of Rachel's interview statements against Carl, or request other procedures for alleviating the prejudice to Carl arising from the admission of Rachel's statements.

## III. RACHEL'S REMAINING CLAIMS

Rachel also argues that she is entitled to a new trial because of misconduct by the prosecutor and because the trial court failed to instruct the jury on the lesser offenses of third- and fourth-degree vulnerable adult abuse. In light of our decision to grant Rachel a new trial due to ineffective assistance of counsel, it is unnecessary to decide these remaining claims.

We reverse defendants' convictions and remand for a new trial. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Michael J. Kelly